### *In re* ESTATE OF MAGNUS.

#### MAGNUS *v.* McGREGOR.

WILLS—EVIDENCE TO ESTABLISH WILL—SUFFICIENCY.

In a will contest case, on appeal to the circuit court from the allowance of the will in the probate court, evidence *held*, sufficient to show that testatrix knew what she was doing, was satisfied with the will as drawn, declared it to be her last will, and asked that it be signed and witnessed as such, and that the requirements of the statute (3 Comp. Laws 1915, § 11821) were met.

Error to Saginaw; Snow (Ernest A.), J. Submitted January 8, 1920. (Docket No. 44.) Decided February 27, 1920.

Ernest Magnus presented for probate the last will and testament of Wilhelmina Magnus, deceased. The will was allowed in the probate court, and Elsie McGregor appealed to the circuit court. Judgment for proponent. Contestant brings error. Affirmed.

*E. L. Beach* and *R. L. Crane,* for appellant.

*Otto & Davis,* for appellee.

MOORE, C. J. This is a will contest. The contestant introduced no evidence. At the conclusion of the testimony offered on the part of the proponent both parties asked for a directed verdict.

The claim of the contestant was stated as follows:

"We request the court to direct the jury to return a verdict that this was not the last will and testament of the deceased. The testimony affirmatively shows that the testatrix did not know the contents of the will as she did not dictate it, neither was it read to her nor by her, but the testimony in this case shows

that she was not acquainted with its contents after the same was drafted. * * * The burden of the proof is upon the person offering the will, and the testimony offered in this case shows affirmatively and beyond any question of doubt that at the time when it is claimed that this will was signed that Mrs. Magnus was not acquainted with the facts in the will.

"The testimony in this case is that after the will was prepared by Mr. Devereaux they all went into the room, nothing was said, and it was signed and witnessed as the witnesses claim, but there is nothing to show that she knew the contents of that will at the time it was signed, and the presumption is in this case that she must have known the contents of the will, but it is affirmatively proven she did not know what it was. Not read to her or by her. We ask the court to direct the jury to return a verdict for the contestant."

The judge declined to direct a verdict in favor of the contestant and charged the jury in part as follows:

"Gentlemen of the jury, this is a matter brought to this court on appeal from the probate court of Saginaw county.

"Wilhelmina Magnus on the 26th day of May, 1917, signed an instrument which purported to be her last will and testament. About a month subsequent to the time of her signing that instrument, Mrs. Magnus died and the will was later offered for probate in the probate court for Saginaw county, and objections were filed to the offering of the will, and this matter was heard and determined by the probate judge, and the will was allowed as and for the last will and testament of Mrs. Magnus. * * *

"The proponent of the will is Ernest Magnus who is one of the heirs at law, the devisee under the terms of the will, by his counsel makes proof of the execution of the will, and produced the attesting witnesses, and you have heard the testimony of these witnesses upon the trial of the case.

"At the close of the testimony of the proponent of the will, the contestant, Mrs. McGregor, through her attorneys, moved the court for a directed verdict in favor of the contestant and against the allowance

of the will, claiming that among other things that there was no evidence that Mrs. Magnus understood the provisions of the will, and that as a matter of fact the will was not read over to her, and that any presumption that might exist by reason of the attestation clause or the proper execution of the will, was overcome by the testimony in the case which the contestant claims shows that Mrs. Magnus did not know the contents of the will. This motion was denied by the court it being the judgment of the court that there is no testimony in this case that warrants the conclusion claimed for by the contestant.

"The will was properly executed, and that any presumption that attaches that she knew the contents of the will, or it was read over to her, which follows the proper execution of the will, has not been overcome by testimony in the case. There is absolutely no testimony in this case that this will was not read over to her, or that she did not know the contents of the will. And the contestant has no proof that has so far been introduced in the case upon which to base her contention that that will was not understood or that it was not read to Mrs. Magnus before the testatrix executed it. On the contrary the conditions were such surrounding the execution of the will, and the proper execution of the will, of such a character that the presumption attaches that she did know the contents of the will, and that it was read over to her. There is no proof in this case to the contrary in the judgment of the court."

Thereupon the jury rendered a verdict in accordance with the instructions of the court sustaining the will.

The contestant now claims:

"(1)   The court erred in not submitting the case to the jury under proper instructions.

"(2)   The record clearly shows that it was impossible for the deceased to have known at the time she asked Mr. Devereaux to sign her name to the claimed will, its contents and the court's decision that it was her last will and testament, and its execution established under this record, is contrary to the facts and law in the case, and he committed error therein."

The will in controversy was drawn by a reputable attorney who unfortunately died before the will was offered for probate. The other two witnesses testified in relation to the execution of the will by Mrs. Magnus; we quote from their testimony.

Ada Kent testified in part as follows:

"I signed my name to the paper three different times. After Mr. and Mrs. Ernest Magnus got through with their dinner I went into the bedroom and talked with Mrs. Magnus, his mother, a little while. I couldn't say how long, a few minutes, when I went out to go home. Went back into the kitchen and she asked Ernest to have me come in there. I went back into the room. She asked me if I would wait a little while and witness her will. I said I would, and I went back into the kitchen and waited until I was called in the room. It might have been half an hour before I was called again, or a little longer. I couldn't say who called me. I went back into the room. In the meantime Mrs. Bounds had come over. Mrs. Bounds, Mr. Devereaux and I went into the bedroom where Mrs. Magnus was.

"Q. How did you come to sign your name on this paper? Explain it to the jury.

"A. Well she was to sign her name. She said 'My arm is lame.' She asked Mr. Devereaux to sign her name as her arm was shaky and couldn't. Mrs. Bounds was present. Mr. Devereaux then signed her name. When she told Mr. Devereaux to sign her name he said 'All right.' He signed her name and signed his own name. I saw him.

"Q. What if anything was then said to you?

"A. I sat on the edge of the bed somewhere. It was quite a small room. Mrs. Bounds, I think, signed her name. I signed. Mrs. Magnus asked her if she would sign it. * * * My name appears on page 3 under the head of witness. I signed it at the request of Mrs. Magnus. I put my name there in the presence of Mrs. Bounds and Mr. Devereaux and Mrs. Magnus. She was there all the time. She asked me to witness her will. She didn't say anything more. Mr. James P. Devereaux signed his name at the bottom of the page on line 25. On line 28 of the third

page and then also on the first page I signed the same. Mr. Devereaux and Mrs. Bounds signed their names. I saw Mr. Devereaux sign his name on the side, as it appears here. I also saw Mrs. Bounds sign her name. * * * I went over there the day in question about one o'clock after we had our dinner. Ernest and his wife were eating dinner when I got over there. There was no one else in the kitchen but Mr. and Mrs. Magnus and the children. Mr. Devereaux was in the dining room writing. The bedroom is off from the dining room. I went from the kitchen into the dining room and into the bedroom and went from the bedroom into the dining room back into the kitchen. I never met Mr. Devereaux before.

"Q. Did you know that Mr. Devereaux was preparing any paper for Mrs. Magnus to sign?

"A. I didn't, but I thought that must be what he was doing. I thought he must be doing something, writing there. He was a stranger to me. I had not learned that she was having a will prepared and I was not invited over there to witness a will.

"Q. You had an idea before you saw him he was preparing a will?

"A. Yes, he was writing. I didn't know what he was doing. He didn't talk to me at all.

"Q. Why did you think Mr. Devereaux was preparing a will?

"A. I don't know; only what I judged.

"Q. Mr. Devereaux went in the bedroom first, didn't he?

"A. I don't know when he went into the bedroom.

"Q. Did you get there before Mr. Devereaux came there?

"A. Mr. Devereaux was there when I got there. He was preparing this paper when I got there. I went into the kitchen, was there a few moments where they were eating. Ernest asked me to go in and see his mother and I did.

"Q. Did you see him writing after you got in there?

"A. He sat there at the table writing. I went into the room where Mrs. Magnus was before I was invited to sign the paper.

"Q. How long did you go into the room and stay there before Mr. Devereaux came in?

"*A.* I went into the room, stayed a few minutes and talked with her. Maybe fifteen minutes. I was inquiring about her condition and she was telling me about her arm. She told me she had been sick a few days. She said she was getting better. I didn't know what the trouble was, but I rubbed her arm for a while while I sat there. It was her right arm. She was lying on the bed; she was dressed, but she was lying there covered up. She didn't get up while I was there. During the time Mr. Devereaux was preparing this paper Mr. Magnus, the son, went into the bedroom. He didn't stay there at all. She spoke to him and he went in there, then he came out and said mother wants me to come in there. I went in there and she asked me if I would stay awhile. When she spoke to him he was right by the dining room door, out near the kitchen. She said 'Ernest' that is what I heard 'Tell Mrs. Kent to come back.' I went back into the room and she asked me if I would not come back, wait a little while and witness her will. I said I would. I didn't stay in the bedroom. It was two or three minutes afterwards when they notified me to come in there.

"*Q.* Was Mr. Devereaux in the bedroom before you went in there?

"*A.* I couldn't say. He was in the dining room when I left the dining room and went into the kitchen.

"*Q.* Where was Mr. Devereaux when you went back there to witness the will?

"*A.* Right there in the room. Right near the bedroom door. I couldn't say whether he was doing any writing at that time or not. He was not talking with anyone when I saw him.

"*Q.* When you went into the room to witness the will, tell us who was in there first.

"*A.* I don't know whether it was Mrs. Bounds or myself. There was a little stand in there where we wrote our names. She didn't have the pen in her hand. She asked him to write her name; she was so shaky.

"*Q.* When she said she wanted him to write her name, that is all you heard her say in the room while you were there, about this will?

"*A.* I wouldn't say whether it was all she said or not.

"Q. Did Mr. Devereaux say anything while he was in the room?

"A. I don't know as he did anything more than sign her name. I don't remember as there was anything said, only about signing of the name.

"Q. All you heard while you were in the room there was 'Mr. Devereaux, I would like to have you sign my name.'

"A. I don't know as she said it just like that. Yes, in substance it was. All that was talked was about signing the name. She asked him to sign her name and she couldn't sign her name on account of her arm. She asked me if I wouldn't witness the paper.

"Q. You have told us what was said by you and Mr. Devereaux, Mrs. Bounds and Mrs. Magnus, haven't you? If there is anything more she said there in reference to that will you tell us?

"A. I don't remember as there was much of anything said in regard to the will; that there was anything said.

"Q. The will was not read over in her presence, was it?

"A. No, sir.

"Q. The will was all prepared when you went back into this room?

"A. I suppose it was prepared. I didn't prepare it.

"Q. Was that paper written up when you went back in the room or before?

"A. He prepared it before he went into the room.

"Q. So you didn't know anything about what was in the paper?

"A. No, sir.

"Q. It was not read to you and Mrs. Magnus didn't say anything about what was in the will?

"A. No, sir.

"Q. When you were in there talking to his mother, you could see Mr. Devereaux? The door was left open?

"A. Yes. I did see him.

"Q. Did you stay in the bedroom visiting with the mother about fifteen minutes?

"A. He was doing this writing at that time. I went out and stayed about two minutes and then went back again. She told Ernest to come back into the

room and I went back and it was about two minutes before I went out. The bedroom door was not closed. It was open. The bedroom door was not closed when I heard Mrs. Magnus talk with Ernest and told me to come back.

"*Q.* Mr. Devereaux didn't have time to read over that paper to Mrs. Magnus from the time you went out there in the kitchen before you went back again, did he?

"*A.* I don't know."

Sarah Bounds testified in part:

"Mr. Magnus came over to our house and asked me if I would come over to his house as his mother wanted to see me and I went over. It was in the afternoon between one and two o'clock. When I entered the house I went into the dining room. There is an outside door leading into this room. I was over in the morning to see her. I just opened the door and walked right in. I was used to going there. I saw Mr. Devereaux there. I never saw him before. I was introduced to him by Mr. Magnus. I went into the bedroom and talked with her. She was lying on the bed, her clothes on; partly covered with clothes. When I went into the bedroom there was no one there.

"*Q.* Did you talk with her?

"*A.* I did. * * * I stayed there until they asked me to go into the bedroom. Mrs. Magnus asked me when I was in there if I would sign her will. She said Mr. Devereaux was making it out and that it was her last will.

"*Q.* What did you say then?

"*A.* I told her yes I would sign it.

"*Q.* Did you sign it?

"*A.* Yes, I did. * * *

"*Q.* I will ask you whether you heard any talk between Mrs. Magnus and Mr. Devereaux about the will.

"*A.* I didn't. There was no one in there but Mrs. Magnus, Mr. Devereaux, myself, and Mrs. Kent.

"*Q.* Then do you recall as to who got into the bedroom first?

"*A.* I couldn't say. I saw Mr. Devereaux sign the will. Mrs. Magnus told him that her arm was lame and her hand shook so she could not sign it and asked

him if he would sign it for her; so he signed it.   It was in her presence.   Mrs. Kent was present at that time.   *   *   *   Mrs. Magnus didn't say anything to us what the paper was, only asked me if I wouldn't sign her will and I did sign the same at the bottom. I saw Mrs. Kent.   I signed my name three times.   Mrs. Kent signed it three times.

"*Q.* Did you remain in there?

"*A.* I did.

"*Q.* And talked with Mrs. Magnus?

"*A.* Yes.

"*Q.* And do you recollect what you talked about?

"*A.* Well, I did.   After Mr. Devereaux went away, he got up and came out into the dining room, sat in the chair, she told me she had got her will made just as she wanted it and she was glad of it.   I remained there about an hour."

The contestants base their claim upon the contention that Mrs. Magnus could not have known the contents of the will because she did not read it, nor was it read to her after Mr. Devereaux finished the writing he was doing when the witnesses saw him.   Mr. Devereaux went to the house for the express purpose of drawing the will.   He was there before either of the witnesses arrived.   How long he had been there does not appear, nor does it appear as to what occurred between him and Mrs. Magnus before the witnesses came, nor does it appear whether he was writing the body of the will, or what seems more likely simply the attestation clause, when the witnesses saw him writing.   Every lawyer knows it would be an unusual thing for the scrivener to read over the will in the presence of the attesting witnesses, or to tell them the contents of the will.   It does appear from the testimony that enough had occurred between Mr. Devereaux and Mrs. Magnus before the witnesses came to demonstrate that she knew what he was doing and was satisfied with it.

We have quoted sufficiently from the testimony to

show that when the writing was completed Mrs. Magnus was satisfied with it and declared it to be her last will and asked that it be signed and witnessed as such. The testimony shows that the requirements of the statute, 3 Comp. Laws 1915, § 11821, were met. See *In re Kennedy's Estate*, 159 Mich. 548 (28 L. R. A. [N. S.] 417, 18 Ann. Cas. 892).

The judgment is affirmed, with costs to the plaintiff.

STEERE, BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.